UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TRACY COMMINGS                                        CIVIL ACTION

VERSUS                                                NO. 07-1099

MIKE HOOKS, INC.                                      SECTION "A"(1)

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this matter was before the Court, sitting without a jury, on April 7, 2008 and reconvened on April 8, 2008.   The court stated its findings with respect to liability on April 8, 2008.  For the reasons orally assigned, the Court found the Plaintiff to be ninety percent at fault and Defendant to be ten percent at fault.  Further, the Court found that the Plaintiff failed to prove that the vessel at issue was unseaworthy.  The Court need not readdress its rulings on liability here.   The Court deferred ruling on the causal relationship between the Plaintiff's injury to the accident until after further medical testimony was heard.

The Court reconvened on May 20, 2008, to take the testimony of Defendant's medical expert Dr. Robert Applebaum, following an MRI performed on April 18, 2008.  After the close of all evidence, the Court took the matter under advisement regarding the issue of damages only

and instructed counsel to submit post-trial memoranda no later than June 15, 2008.  In addition to the testimony presented at trial, the Court considered the depositions of the following witnesses, which were submitted in lieu of live testimony: Anthony M. Martino, M.D., Ralph Lee Irvin, M.D., David Dimmick, and Harry Studdard, II, M.D.

Having now considered the pleadings, the evidence offered at trial, arguments of counsel, and applicable law, and after reviewing the depositions of Dr. Anthony Martino, Dr. Ralph Irvin, David Dimmick, and Dr. Harry Studdard, the Court renders its Finding of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).  To the extent certain findings of fact are more appropriately classified as conclusions of law, they should be so construed.  To the extent certain conclusions of law are more appropriately classified as findings of fact, they should be so construed.

I.    **<u>FINDINGS OF FACT</u>**

    *A.    Medical Testimony*

Four doctors testified as to Plaintiff's physical condition.  In addition, David Dimmick testified regarding the Functional Capacity Evaluation ("FCE") he performed on the Plaintiff. The Court considered Dr. Applebaum's testimony at trial and reviewed the depositions submitted in lieu of live testimony.

    *1.    Testimony of Dr. Anthony Martino*

Dr. Anthony Martino testified as an expert in neurosurgery.[1]  He is a neurosurgeon at University of South Alabama Medical Center.  Martino examined the Plaintiff on November 16, 2006, while the Plaintiff was in the emergency room, and determined that he had a compression fracture at C-5.[2]  According to Martino, the fracture was caused by a direct pressure from the top of the head straight down, which is consistent with an accident sustained while diving off of a boat into shallow water and hitting the top of the head.[3]

Dr. Martino performed an anterior cervical corpectomy on the Plaintiff on November 17, 2006, which he described as "routine."[4]   Plaintiff was discharged on November 20, 2006.[5] Martino testified that the length of time before one reaches maximum medical improvement ("MMI") is variable depending on neurologic condition, but it can be anywhere from three to six months.  Recovery time for this type of surgery is generally three to six months.[6]

Dr. Martino saw the Plaintiff again on December 4, 2006.  The Plaintiff complained of neck pain, some frontal headaches, and leg pain.[7]  The Plaintiff did not complain of lower back

_____

[1]Deposition testimony of Dr. Martino p. 9.

[2]*Id.* at p. 9-10.

[3]*Id.* at p. 11.

[4]*Id.* at p. 13.

[5]*Id.* at p. 15.

[6]*Id.* at p. 16.

[7]*Id.* at p. 17.

pain before that visit.[8]  Dr. Martino conducted a neurologic exam of the lumbar spine and lower extremity; he did not find a neurological deficit.   The Plaintiff's only complaints were subjective.[9]  Dr. Martino felt that "[e]verything was on course."[10]

On December 19, 2006, the Plaintiff returned for an office visit, complaining of residual neck pain, low back pain, and left leg pain.[11]  Dr. Martino conducted a physical exam and found no sign of neurological deficit.[12]  Dr. Martino reviewed the MRI that he previously had ordered on December 12, 2006.  According to Dr. Martino, the MRI revealed degenerative disc disease at L5-S1 and spondylolisthesis, grade zero to one.[13]  Zero to one is the lowest grade.  As such, he described it as a minimal offset of L5 on S1.[14]  He "thought that [the degenerative disc disease and the spondylolisthesis] might be the cause of [Plaintiff's] back and leg pain."[15]

Dr. Martino compared the December MRI to Commings' pre-employment MRI and noted

--------

[8]*Id.*

[9]*Id.* at p. 18.

[10]*Id.* at p. 19.

[11]*Id.*

[12]*Id.* at p. 20.

[13]*Id.* at p. 21.

[14]*Id.*

[15]*Id.*

no significant change.[16]   At that time, Dr. Martino prescribed therapy, a cervical brace, and medication, including Lortab.[17]

On January 9, 2007, Commings returned to see Dr. Martino and complained of neck and back pain and pain into his left lower extremity.[18]   The Plaintiff had a "normal neurological exam" for the cervical and lumbar spine.[19]   Dr. Martino observed that Commings used a cane and limped.[20]   When asked about the possible inconsistency between a normal neurological exam and a limp, Dr. Martino explained that "[i]t could be mechanical pain, so it could be spondylolisthesis causing some pain and irritation.   And even though his neurological exam is normal, he still could have radicuar pain."[21]   Dr. Martino added that with subjective complaints of pain, a physician relies on the patient to be truthful.[22]

On February 6, 2007, the Plaintiff returned to see Dr. Martino, and Dr. Martino reported

_____

[16]*Id.* at p. 23.

[17]*Id.* at p. 24.   The Court orally addressed an issue involving the Plaintiff's use of Lortab.   The Court need not readdress those findings.

[18]*Id.* at p. 25.

[19]*Id.* at p. 25-26.

[20]*Id.* at p. 26.

[21]*Id.* at p. 26-27.

[22]*Id.* at p. 28.

no change in Commings' reported symptoms.[23] Dr. Martino conducted a cervical spine x-ray and determined that the surgery area looked stable; the alignment was good and nothing changed. The Plaintiff had a normal neurologic examination.  Dr. Martino does not recall if Plaintiff was using a cane on that visit.[24]

Dr. Martino subsequently examined the Plaintiff on March 13, 2007, April 10, 2007, and May 8, 2007.  The Plaintiff had the same complaints of neck and low back pain.  Dr. Martino reported no changes.  The Plaintiff was still limping in March and April 2007.[25]

Dr. Martino described the May 8, 2007 visit as follows: "Really, he complained of neck pain and no significant change, to be honest with you.  His neurologic exam remained intact."[26] Commings did not make the same complaints about his lumbar spine on that date.[27] Significantly, Dr. Martino believes that Commings reached maximum medical improvement as of May 8, 2007.[28]  Further, Dr. Martino testified that any type of pain management for the cervical spine would be palliative treatment.[29]

---

[23]*Id.* at p. 30.

[24]*Id.* at p. 31.

[25]*Id.* at p. 31-33.

[26]*Id.* at p. 34.

[27]*Id.* at p. 34-35.

[28]*Id.* at p. 35.

[29]*Id.* at p. 39.

On July 10, 2007, Commings visited Dr. Martino's office because he continued to have worsening neck and shoulder pain.[30]  Again, Plaintiff had a normal neurologic exam.[31]  Dr. Martino reviewed the functional capacity evaluation ("FCE") that he previously ordered.[32]  This was the last time that Dr. Martino saw Commings as a patient.[33]

Dr. Martino explained that the Plaintiff had a "real problem" with his neck fracture.[34]  In regards to Plaintiff's lower back, Dr. Martino felt that the Plaintiff had objective findings on the x-ray that were not inconsistent with some of the symptoms of which he was complaining.[35]  Dr. Martino compared the pre-accident and post-accident MRIs and noted that they appeared to be structurally similar.  However, according to Dr. Martino, this similarity does not mean that the Plaintiff did not sustain an injury to his low back as a result of the accident.  As he explained, an accident may cause pre-existing conditions, previously asymptomatic, to become painful.[36]  Dr. Martino noted that Commings' symptoms and his injury might not necessarily cause structural change, but they may cause exacerbation of symptoms or irritation of nerves and surrounding

---

[30]*Id.* at p. 35.

[31]*Id.* at p. 36.

[32]*Id.*

[33]*Id.* at p. 39.

[34]*Id.* at p. 42.

[35]*Id.*

[36]*Id.* at p. 56-57.

structures and muscles, in which case one would not see anything objectively in the bony structures.[37]  Dr. Martino was not aware of any prior complaints of low back pain.[38]  Dr. Martino testified that "[i]f he had no prior injury and no prior event of back problems, then yes, the [November 5, 2006] accident could have been responsible for [Plaintiff's] low back pain."[39]

### 2.     Testimony of Dr. Harry Studdard

Dr. E. Harry Studdard, II was Plaintiff's primary care physician.  He has a private practice at Mobile Adult Care, a primary care internal medicine center in Mobile.[40]

Dr. Studdard's colleague, Dr. Eddie Pace, saw the Plaintiff on November 13, 2006; Commings was complaining of neck pain.[41]  Clinic notes reveal calls to Dr. Studdard's office on November 27, 2006, November 30, 2006, December 6, 2006, and December 7, 2006, regarding wheel chair and hospital bed requests and a Worker's Compensation form.[42]

Dr. Studdard met with the Plaintiff on December 9, 2006, to follow-up on Commings' blood pressure.[43]  He noted that Commings complained of severe pain and his inability to lay

---

[37]*Id.*

[38]*Id.* at p. 58.

[39]*Id.*

[40]Deposition testimony of Dr. Studdard p. 6.

[41]*Id.* at p. 23.

[42]*Id.* at p. 29-30.

[43]*Id.* at p. 26.

down in a regular bed.[44]  In the neurologic exam, Commings complained of decreased sensation in the left foot and leg, while the right side was normal.[45]  Commings' neck was in a rigid brace. The Plaintiff was referred to Dr. Faircloth, another neurosurgeon.[46]  Dr. Studdard's notes read: "neck and back pain with paresthesias on left side."[47]

The Plaintiff returned on February 27, 2007, for a follow up visit.[48]  According to Dr. Studdard, clinically there were no changes in symptoms or examination.[49]  The Plaintiff's blood pressure was slightly elevated.[50]

On June 13, 2007, the Plaintiff returned to Dr. Studdard.[51]  Commings reported that he had a fusion done but still had persistent pain in his neck.[52]  Dr. Studdard referred the Plaintiff to Dr. Irvin for pain management[53] because he was still complaining of persistent pain in his

---

[44]*Id.*

[45]*Id.*

[46]*Id.* at p. 27.

[47]*Id.* at p. 42.

[48]*Id.* at p. 31.

[49]*Id.*

[50]*Id.*

[51]*Id.* at p. 35.

[52]*Id.*

[53]*Id.* at p. 36.

neck.[54]  This June 13, 2007 visit was the last time that Dr. Studdard saw Mr. Commings.[55]

Dr. Studdard testified that he had not seen the Plaintiff without a cane since the accident.[56] He did not recall seeing the Plaintiff without a neck brace since that time either.[57]  Dr. Studdard was shown the surveillance video taken on February 19, 2007.  He stated that the video was inconsistent with the exam performed on February 27, 2007.[58]  Also, the video was inconsistent with the pain management and pain pills that Dr. Studdard was prescribing during that time.[59]

### 3.     Testimony of Dr. Ralph Lee Irvin

The parties stipulated to Dr. Irvin's expertise in the field of pain management and anesthesiology.  Ralph Lee Irvin, M.D., is a pain management specialist in Mobile, Alabama. He also treated the Plaintiff following the accident.[60]  Dr. Irvin first saw the Plaintiff on July 13, 2007, at the request of Doctor Studdard.[61]  The Plaintiff complained of cervical pain and some pain in his low back.  Dr. Irvin deferred treatment of Plaintiff's lumbar area and only addressed

---

[54] *Id.* at p. 38-39.

[55] *Id.* at p. 36.

[56] *Id.* at p. 38.

[57] *Id.*

[58] *Id.* at p. 44.

[59] *Id.* at p. 45.

[60] Deposition testimony of Dr. Irvin p. 5.

[61] *Id.* at p. 8.

10

Commings' cervical problems at this initial examination.[62]  His examination of Plaintiff's neck indicated evidence of Commings' previous surgery.[63]  Dr. Irvin's preliminary diagnosis was cervical radiculitis (irritation of the nerve roots); cervical spondylosis (arthritic changes in joints of the neck); and cervical failed back surgery syndrome.[64] Dr. Irvin examined the Plaintiff's back and lower extremities.  He noted that the Plaintiff's deep tendon reflexes were normal and equal.[65]  Dr. Irvin ordered an updated cervical MRI and medication.[66]

A few weeks later, on August 1, 2007, the Plaintiff underwent an MRI at the Alabama Orthopaedic Clinics.[67]  The MRI confirmed surgery at the C5-6 level, consistent with the history that the Plaintiff had given.[68]  Dr. Irvin considered the findings of this MRI compatible with Commings' complaints of neck pain, as well as the upper extremity symptoms.[69]

When Dr. Irvin saw the Plaintiff on August 10, 2007, he recommended a cervical epidural

---

[62]*Id.* at p. 9.

[63]*Id.* at p. 12.

[64]*Id.* at p. 13-14.

[65]*Id.* at p. 13, 39.

[66]*Id.* at p. 14.

[67]*Id.* at p. 18.

[68]*Id.* at p. 22.

[69]*Id.* at p. 24.

steroid injection, which he performed on August 24, 2007.[70]  Dr. Irvin described this procedure

as "uneventful."[71]  On August 30, 2007, Mr. Commings called Dr. Irvin's office and reported

ninety percent relief of neck and arm pain.[72]  According to Dr. Irvin, Mrs. Commings called "a

week or so later" and asked him to repeat the procedure.[73]  Dr. Irvin advised that they needed to

wait a month between procedures.  Mrs. Commings informed Dr. Irvin that her husband's pain

started returning to a significant degree on September 1 or 2, 2007, which Dr. Irvin noted was

the day after Mr. Commings called to report excellent relief.[74]

On October 3, 2007, Dr. Irvin again saw the Plaintiff in his office.  Commings reported

that his pain was becoming significant again, although he stated that it had improved since the

procedure.[75]  On November 14, 2007, Dr. Irvin performed a steroid injection.[76]  A week later, on

November 26, 2007, Commings reported 30% relief from the procedure.[77]

On December 14, 2007, Commings returned to Dr. Irvin's office.  Dr. Irvin found "trigger

---

[70]*Id.* at p. 25-26.

[71]*Id.* at p. 27.

[72]*Id.*

[73]*Id.* at p. 28.

[74]*Id.*

[75]*Id.* at p. 30.

[76]*Id.* at p. 34.

[77]*Id.* at p. 34-35.

points" in the musculature of Commings' neck; he injected two of them with local anaesthetic and with steroid.[78]  In addition to neck complaints, the Plaintiff complained of neck and low back pain and "give away" in his leg.[79]  Dr. Irvin stated that this information regarding low back pain and "give away" was inconsistent with the lower back exam performed on July 13, 2007.[80]  According to Dr. Irvin, if the history taken on December 14, 2007, was accurate, it would indicate to him that something else happened to Commings between July 13, 2007 and December 14, 2007.[81]

As of the date of Dr. Irvin's deposition, he had not conducted a thorough back exam of the Plaintiff's lower back or rendered a treatment plan for that area.[82]  Dr. Irvin was not addressing those symptoms until resolution or improvement of the Plaintiff's "worst problem, which is the one that he was referred to me, and that being the cervical and upper extremity complaints."

### 4.    Testimony of David Dimmick

David Dimmick, an exercise pathologist, is Director of Work Hardening at Industrial

---

[78]*Id.* at p. 35.

[79]*Id.*

[80]*Id.* at p. 65.

[81]*Id.* at p. 65-55.

[82]*Id.* at p. 39.

Wellness and Rehabilitation ("IWR") Therapy Services, in Mobile, Alabama.[83]   Dimmick performed the FCE of Mr. Commings on June 28, 2007, which was requested by Dr. Martino.[84] Dimmick recommended that the Plaintiff could return to light duty work within his demonstrated tolerances if approved by the attending physicians or within the recommended restrictions as assigned by the attending physicians.[85]

Dimmick explained that there are many mechanisms in place to detect possible inconsistencies in effort or symptom magnification.[86]  For example, Waddell's is a symptom magnification evaluation used to determine if someone is magnifying symptoms in regards to the lower back.[87]  After performing these tests, Dimmick concluded that Commings tested negative and that he did not detect signs of inconsistencies or symptom magnification.[88]  The Court has no reason to doubt Mr. Dimmick's findings.

### 5.      Testimony of Robert Applebaum

Dr. Applebaum, defense expert in neurosurgery, testified before the Court on April 8, 2008.  Dr. Applebaum first examined the Plaintiff on February 1, 2007.  Plaintiff complained of

---

[83]Deposition testimony of Mr. Dimmick p. 5-8.

[84]*Id.* at p. 6.

[85]*Id.* at p. 32.

[86]*Id.* at p. 32-37.

[87]*Id.* at p. 34.; See also, Trial Exh. 1G.

[88]*Id.* at p. 38.

mid-back pain to low-back pain, which the Plaintiff attributed to his November 5, 2006 injury. Commings reported to Dr. Applebaum that he experienced daily pain in his back. According to Dr. Applebaum, the Plaintiff noted vague weakness in his left leg, but he was not very specific. Commings denied previous difficulty with his back, neck, or legs. Dr. Applebaum reported in February 2007 that he did not think the low back pain was related to the November 5, 2006 accident.

Dr. Applebaum next examined the Plaintiff on February 20, 2008. The Plaintiff again complained of pain in his neck and low back, although the pain was more severe in the back than in the neck. He specifically described his low back pain as aching in nature and almost constant. An examination of the low back revealed minimal limitation of motion. The Plaintiff also complained of weakness or pain in the left leg. He said the pain was more severe in his low back than his neck. Dr. Applebaum saw the Plaintiff for the last time on February 20, 2008.

Dr. Applebaum reviewed MRIs performed in September 2006 and December 2006. Dr. Applebaum testified that the MRIs showed moderate bulging of the disc or a spur. He did not see a significant difference between the two MRIs. Dr. Applebaum concluded that the Plaintiff could return to moderate work. Dr. Applebaum opined that the Plaintiff should not lift more than 30-40 pounds and should avoid overhead lifting. According to Dr. Applebaum, it was a temporary impairment. Dr. Applebaum thought that Plaintiff needed another MRI of the spine.

Dr. Applebaum resumed his testimony on May 20, 2008. On that date, Dr. Applebaum

discussed the recent MRI of the Plaintiff's back, performed on April 18, 2008.  Dr. Applebaum

pointed out the degenerative changes.  Regarding spondylolisthesis, Dr. Applebaum testified that

there was a little offset of L-5 on S-1, which was present pre-operative.  He said that one "might

want to call it minimal spondylolisthesis" but added that it is "certainly stable."  He recognized

that there were "definitely significant degenerative changes," such as lipping anteriorly between

the L-5 and sacrum.  This finding is the same as on the pre-injury film.  Dr. Applebaum showed

the Court the pre-injury MRI, performed September 25, 2006, and stated that the "film looks

quite similar at this level."  Dr. Applebaum did not see evidence of a herniated disc or nerve root

irritation.  (Trial Exh. 42).

Dr. Applebaum testified that on the Plaintiff's first visit, in February 2007, the Plaintiff

had rigidity in the lower back, which is an objective finding.  Dr. Applebaum acknowledged that

he had no evidence that the Plaintiff experienced rigidity or pain before the accident.  However,

according to Dr. Applebaum, had Plaintiff strained or sprained his back in the accident, the injury

would have healed in three to six months.  He further testified that to the extent the Plaintiff

experienced any pain or rigidity now, such pain or rigidity would related to the degenerative

changes.  Assuming that the Plaintiff had consistent complaints of low back pain following the

accident, Dr. Applebaum would have reason to say that the Plaintiff's back condition was not

related to the accident, based on his findings on the Plaintiff's examination, diagnostic studies,

and the Plaintiff's history.  Dr. Applebaum testified that it is his opinion that Plaintiff's back

16

complaints are not related to his accident which forms the basis of this litigation.  This opinion

is consistent with Dr. Applebaum's opinion rendered in February 2007.

Dr. Applebaum believes that the Plaintiff has not reached maximum medical improvement

regarding his low back.  He would recommend treating the Plaintiff with anti-inflammatory

medication, such as Advil, heat, and physical therapy.  He thinks that the Plaintiff can improve

with therapy.

### B.    Testimony as to Commings' Lost Wages

Margo Hoffman, the Defendant's vocational rehabilitation expert, rendered conclusions

regarding Plaintiff's future employment prospects.  She noted that Commings was previously

employed as a barber, which is a job that requires light physical exertion.   Based on her review

of the medical information in Mr. Commings' file, she testified that Commings would be able to

return to work as a barber, with average earnings of $18,600 per year.

## II.    CONCLUSIONS OF LAW

The parties stipulated that the Defendant paid maintenance and cure until August 29,

2007, the date of Dr. Martino's deposition.  (Trial Exh. 36).  In addition, the parties agreed that

they are not aware of any outstanding cure.

### A.    Extent and Causation of Plaintiff's back injury

Defendant does not dispute that Plaintiff sustained a neck injury as a result of the accident

on November 5, 2006.  Rather, Defendant disputes the extent and causation of Plaintiff's back

pain. Specifically, the parties disagree as to whether Plaintiff's current back complaints were caused by or are related to the accident.

A seaman is entitled to recover under the Jones Act "if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997). After considering the testimony of Dr. Applebaum and reviewing the deposition testimony of the other medical experts, this Court finds that the Plaintiff has failed to prove that his back problems and back pain are causally related to the accident.

All of the medical experts in this matter agree that the Plaintiffs' degenerative disc disease and spondylolisthesis existed prior to Mr. Commings' accident on November 5, 2006. Dr. Martino suggested that these conditions could have become symptomatic, and therefore painful, as a result of the incident at issue. Further, Dr. Martino hypothecated: "If he had no prior injury and no prior event of back problems, then yes, the [November 5, 2006] accident could have been responsible for [Plaintiff's] low back pain."[89]  However, Dr. Martino never made a definitive statement as to causation in his deposition testimony.

Dr. Martino's speculative testimony on this issue is directly contradicted by the testimony of Dr. Applebaum, who unequivocally stated before the Court that the Plaintiff's current back pain is not related to the accident. Further, he explained that had the Plaintiff sustained a back injury in the accident, such as a sprain or strain, that type of injury would have healed in three

---

[89]Deposition testimony of Dr. Martino p. 58.

to six months.  As such, he testified that to the extent that the Plaintiff experiences any pain or rigidity now, such pain or rigidity would relate to the degenerative changes.  Based on his findings on the Plaintiff's examinations, diagnostic studies, and the Plaintiff's history, Dr. Applebaum opined that the Plaintiff's low back complaints were not related to the accident.

The Court closely listened to and observed Dr. Applebaum and finds him to be a credible witness on this issue.  The Court reviewed and compared the MRI performed on April 18, 2008 with the MRI performed prior to Mr. Commings' employment and agrees that there is no significant change in the MRIs.

Moreover, Dr. Applebaum's testimony is consistent with that of Dr. Irvin, who stated that the Plaintiff's complaints of low back pain and give-away in December 2007 were not consistent with the lower back exam he performed in July 2007, which would indicate to Dr. Irvin that an intervening event occurred between July 13, 2007, and December 14, 2007.

Based on the foregoing, the Court finds that the Plaintiff's current low back pain was not caused by the accident which occurred on November 5, 2006.

### B.      Commings' Maintenance and Cure

Commings seeks damages for failure to pay maintenance and cure after August 27, 2007. The Fifth Circuit explains the right to maintenance and cure as follows:

> Maintenance and cure are centuries old remedies under the general maritime law. A seaman's right to maintenance and cure is implicit in the contractual relationship between the seaman and his employer, and is designed to ensure the recovery of these individuals upon injury or sickness sustained in the service of

> the ship.  Maintenance and cure are due without regard to the negligence of the employer or the unseaworthiness of the ship.  Maintenance is a per diem living allowance, paid so long as the seaman is outside the hospital and has not reached the point of "maximum cure."  Cure involves the payment of therapeutic, medical, and hospital expenses not otherwise furnished to the seaman, again, until the point of "maximum cure."

*Gaspard v. Taylor Diving and Salvage Co., Inc.*, 649 F.2d 372, 374 n. 3 (5th Cir. 1981) (citing

*Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979)).

> Maximum cure occurs:

> when it appears probable that further treatment will result in no betterment of the seaman's condition.  Thus, where it appears that the seaman's condition is incurable, ***or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved***.

*Id.* (citing *Pelotto*, 604 F.2d at 400) (emphasis added).  "Therefore, when a particular medical

procedure is merely palliative in nature or serves only to relieve pain and suffering, no duty to

provide payment for cure exists." *Johnston v. Tidewater Marine Service*, 116 F.3d 478, 1997 WL

256881, at *2 (5th Cir. 1997) (unpublished).

The burden of proving the right to maintenance and cure rests with the seaman.  *Pelotto*,

604 F.2d at 404.  To establish a claim for maintenance and cure, a seaman need only show that

his injuries occurred while in service to the vessel.  *Daigle v. L & L Marine Trans. Co.*, 322

F.Supp.2d 717, 729-30 (E.D. La.  2004) (Fallon, J.)( citing *Boudreaux v. United States*, 280 F.3d

461, 468 (5th Cir. 2002)).  Any ambiguities regarding a seaman's right to receive maintenance and

cure should be resolved in favor of the seaman.  *Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79

(5th Cir. 1990) (quoting *Vaughan v. Atkinson*, 369 U.S. 527, 532, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962)).

The Defendant terminated the Plaintiff's maintenance and cure payments as of August 29, 2007, the date of Dr. Martino's deposition, during which Dr. Martino stated that Commings reached the point of MMI months earlier, on May 8, 2007.  (Trial Exh. 36).

Whether the seaman reaches the point of MMI is a medical question, and reliance on the advice of a physician is necessary to determine that point.  *Guidry v. The Offshore Drilling Co., Inc.*, No. 06-569, 2007 WL 519761, at * 3 (W.D. La. Feb. 15, 2007) (citing *Breese v. AWI, Inc.*, 823 F.2d 100 (5th Cir. 1987)).  The only testimony that addresses the issue of MMI is that rendered by Dr. Applebaum and Dr. Martino.  Dr. Martino unequivocally stated that Plaintiff reached MMI on May 8, 2008.[90]  Dr. Martino added that any type of pain management for Plaintiff's cervical spine would be palliative treatment.[91]

The Plaintiff asserts that he has not reached MMI because he continues to suffer low back pain and headaches.  The Plaintiff refers to the testimony of Dr. Applebaum, who stated that he does not think that the Plaintiff has reached MMI regarding his lower back.  As discussed above, the Plaintiff failed to establish that he suffers from back pain *resulting from the accident* that requires continuing treatment.

---

[90]*Id.* at p. 35.

[91]*Id.* at p. 39.

Dr. Applebaum added that he would treat the Plaintiff's low back pain with anti-inflammatory medication, heat, and physical therapy. The Plaintiff provided no medical testimony to support the contention that any future treatment would improve his medical condition, rather than merely palliative treatment.

The Plaintiff failed to prove that he has yet to reach MMI for injuries related to the accident at issue in this case. As such, the Court concludes that the Plaintiff is not entitled to any additional maintenance and cure.

### III.   PLAINTIFF'S DAMAGES

Under the Jones Act, a plaintiff may recover all of his pecuniary losses. *Johnson v. Cenac Towing*, 468 F.Supp.2d 815, 834 (E.D. La. 2006) (Vance, J.) (citing *Cruz v. Hendry Int'l Co.*, 638 F.2d 719, 723 (5th Cir. 1981), *rev'd on other grounds by Michel v. Total Transportation, Inc.*, 957 F.2d 186, 191 (5th Cir. 1992)). Such pecuniary losses may include loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. *Harrison v. Diamond Offshore Drilling, Inc.*, No. 07-417, 2008 WL 708076, at *17 (E.D. La. Mar. 6, 2008) (Vance, J.) (citing *Daigle*, 322 F.Supp.2d at 730). In the present case, Plaintiff has not provided any evidence of outstanding unpaid medical expenses.

#### A.   *Past Wage Loss and Loss of Earning Capacity*

The Plaintiff testified that he did not work in 2007 as a result of the accident. However, at his deposition on March 14, 2008, he indicated that he was looking for a job, at the time of his

previous deposition, which took place on June 26, 2007.

Both parties submitted expert reports from economists, calculating the Plaintiff's past lost wages. Initially, the Plaintiff's expert, Dr. G. Randolph Rice, estimated past after-tax wage loss to be $52,788.00, considering the wages Commings might have received from the date of his accident until the date of trial. (Trial Exh. 37A). Subsequently, Dr. Rice revised these findings on April 2, 2008. As explained in this latter report, Plaintiff's counsel advised Dr. Rice that Commings was capable of returning to work on April 1, 2008, earning $18,600 per year. (Trial Exh. 37B). In the letter submitted to the Plaintiff's counsel, Dr. Rice indicates that Mr. Guidry provided two alternative base annual incomes to consider as Mr. Commings' pre-accident earning capacity, particularly $20,858.45 and $24,560.96. Dr. Rice estimates that after tax, Plaintiff would have earned $29,377.00 or $34,427.00, respectively, from the date of injury to the date of trial. (Trial. Exh. 37B).

Defendant submitted the report of Dr. Kenneth J. Boudreaux, who offered results based on annual pretax income amounts of $19,491.85 and $23,536.07. (Trial Exh. 38B). Regarding past loss, Dr. Boudreaux assumed that Commings could have returned to work as of November 15, 2007, at $18,600.00 per annum. Utilizing this data, Dr. Boudreaux estimated Plaintiff's past loss as $18,617.23 or $23,348.99, respectively. (*Id.*)

Alternatively, through its post-trial memorandum, Mike Hooks calculates past wage loss from the date of the accident until the date Plaintiff reached MMI. Defendant uses an average

23

gross earnings of $11,403.42.  Based on this analysis, Defendant urges that Plaintiff's past wage loss is $5,700.

Dr. Boudreaux explained that the choice of an appropriate wage base depends upon which figure more correctly corresponds to what would have been Commings' likely production of sustained income across significant periods of time.  (Trial Exh. 38B).  Plaintiff's average annual earnings from 2003 to 2006 totaled $13,453.42; however, from 2004 through 2006, Plaintiff earned an average of $16,113.02 per year.  (Trial Exh. 40).  In 2006, Plaintiff earned $19,603.44.  (*Id.*)  Based on this earnings history, the Court finds that Dr. Boudreaux's estimated wage base of $19,491.85 is an appropriate base from which to calculate Mr. Commings' past wages.

The most glaring difference between the two experts' estimates is the date used to signify the point at which Commings could have returned to work.  As noted above, Dr. Rice utilizes the trial date, while Dr. Boudreaux assumed that Commings could have returned to work as of November 15, 2007.  Although the Court cannot ascertain how Dr. Boudreaux arrived at this date, the Court finds that this date is more appropriate than the date suggested by the Plaintiff's expert.  November 15, 2007 is well beyond the time that MMI was reached.  November 15, 2007 is also after the Plaintiff's treating surgeon cleared him for light duty.  Ms. Hoffman testified that a barber is classified as a light, physical exertion job, which the FCE indicates Plaintiff was capable of performing as of June 2007.  Plaintiff has kept his barber's certification current.  There is no evidence that the Plaintiff was unable to return to work as of that date.

As such, the Court gives Dr. Boudreaux's calculations greater weight. Employing an annual pretax income base of $19,491.85, Plaintiff's after tax past wage loss is $18,617.23. (Trial Exh. 38B). Therefore, the Court finds that Plaintiff is entitled to an award of $18,617.23 for past lost wages.

In addition, the Plaintiff claims future loss of earnings. An award for future loss of earnings represents the difference between a plaintiff's earning capacity before and after a disabling injury. *Barocco ex rel. Barocco v. Ennis Inc. of Colo.*, No. 02-1450, 2003 WL 21406179, at *3 (E.D. La. June 16, 2003) (Vance, J.). The Court finds that the Plaintiff is not entitled to any future wages. As stated in open court, this Court believes that the Plaintiff's true vocation is to be a barber. The Plaintiff testified that he was an "excellent barber" and touted a few famous clients. Moreover, the Plaintiff stated that he did not want to be away from his family. As such, a job offshore would conflict with this desire to be closer to home.

The Plaintiff's wife testified that Commings was "not a very good wage earner." In 2006, Plaintiff earned $19,603.44. (Trial Exh. 40). Ms. Hoffman testified that a barber in Mobile, Alabama earns $18,600 each year, on average. At the high end of the earning spectrum, Hoffman stated that a barber could earn $38,000 in a year. Hoffman thinks that the Plaintiff will be able to advance quickly due to his prior experience as a barber in Mobile. Further, according to Hoffman's research in the Mobile area, the more skilled a barber becomes, "it's easy to earn $1000 per week."

The Court closely observed Ms. Hoffman, carefully considered her testimony, and finds her to be a credible witness on this issue. Based on the foregoing, the Court does not find there to be a consequential difference in loss of future earnings such that the Plaintiff would be entitled to future lost wages.

### B.      Pain and Suffering

The Court orally stated its findings regarding the Plaintiff's credibility as to his level of pain. While the Court has serious doubts as to the Plaintiff's current pain and suffering, as well as the pain he was experiencing at the time that the surveillance videos were taken, the Court heard testimony from the Plaintiff and his wife regarding the Plaintiff's intense pain immediately following the accident. This testimony is supported by the medical evidence concerning the Plaintiff's neck injury. There is no doubt that the Plaintiff sustained a fractured neck which required surgery. After closely listening to the Plaintiff and his wife about the events immediately following the accident, the Court finds that the Plaintiff was in a great deal of pain in the wake of the accident. In particular, the Plaintiff was transported to the emergency room in a truck and without a neck brace or a spinal board. The Plaintiff testified that he could feel every bump in the road. He initially was sent home from the Singing River Hospital emergency room in a soft foam collar, instead of a hard collar. Before embarking on the drive home, the Plaintiff had to make a few stops, including to a McDonald's in Ocean Springs, where he gave a statement to Steve Furst. (Trial Exh. 22). The Plaintiff testified that he was in "tremendous

pain" on the ride home, despite the fact that he used clothes as a pillow during the ride.  Mrs. Commings testified that upon arriving home, her husband was "screaming in pain."  Mrs. Commings immediately called an ambulance, which took Plaintiff to the emergency room at University of South Alabama Hospital.  After a miscommunication among attending physicians, the Plaintiff was released.  The Plaintiff testified that he suffered for ten days before he saw Dr. Pace, who diagnosed the Plaintiff with a compression fracture, necessitating surgery.  The Plaintiff then underwent a cervical corpectomy and fusion with instrumentation performed by Dr. Martino.

Based on the foregoing, the Court finds that the Plaintiff has endured extreme pain and suffering as a result of his neck injury.  In addition to the Plaintiff's neck pain, the Plaintiff testified that he underwent dental work performed by Dr. Allen as a result of the accident, an allegation which Defendant did not dispute.  However, in reaching its award, this Court will not consider any pain and suffering Plaintiff alleges to have experienced as a result of his back pain because the Plaintiff failed to establish the requisite causal connection between the accident and his back condition.

The Plaintiff asserts that he is entitled to a sum of "at least" $400,000 for past pain and suffering and $300,000 for future pain and suffering.  To support his award, Plaintiff cites cases awarding amounts ranging from $500,000 to $900,000.  The Court has reviewed those cases and finds them all to be distinguishable.  For example, the $500,000 award compensated a plaintiff

for a "burst fracture" of the C-7, or a broken neck.  *See Dekeyser v. Automotive Casualty Ins. Co.*, 706 So.2d 676 (La. App. 4 Cir. 1998).  In that case, rather than opting for surgery, the plaintiff chose to wear a halo vest, which required four pins to be screwed into his scull.

In addition, the Plaintiff cited *Moore v. Kenilworth/Kailas Properties*, a case in which the plaintiff had a cervical spine injury which necessitated a two-level fusion.  865 So.2d 884 (La. App. 4 Cir. 2004).  The plaintiff's doctor in that case testified that the plaintiff would need another two years of pain management.  *Id.* at 891.  The plaintiff complained of depression, extreme neck pain, and sexual dysfunction. *Id.*  The court held that given the plaintiff's physical and psychological injuries, an $800,000 award did not "shock the conscience." *Id.* at 892.  In the present case, however, the Court was presented with no such evidence, although such conditions were briefly mentioned.  Moreover, Mr. Commings did not endure a two level fusion.

Finally, Plaintiff cites *Parquette v. Certified Coating of California, Inc.*, 966 So.2d 91 (La. App. 4 Cir. 2007).  In that case, the plaintiff complained of pain in the neck, numbness, shaking, tingling, nervousness, and headaches. *Id.* at 95.  An MRI revealed a "bad disc" in the plaintiff's neck pinching a nerve. *Id.*  Before surgery, the doctor warned that the plaintiff would suffer pain for the rest of her life. *Id.*  The doctor performed a cervical fusion to relieve most of the plaintiff's symptoms from the disc protrusion. *Id.* at 97.  The court noted that the plaintiff might need surgery in the future to correct a spur and disc mix at the C4-5 vertebrae. *Id.*  The court upheld an $800,000 award for past pain and suffering. *Id.* at 94.

The Court conducted an independent review of awards for pain and suffering following an anterior cervical fusion similar to that performed on the Plaintiff.  Based on the Court's review, the Court finds that an award of $200,000.00 is appropriate in this case to compensate the Plaintiff for his past pain and suffering.  *See Dixon v. Travelers Ins. Co.*, 842 So.2d 478 (La. App. 4 Cir. 2003); *Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779 (5th Cir. 2003); *Konneker v. Sewerage & Water Bd. of New Orleans*, 703 So.2d 1341 (La. App. 4 Cir. 1997); *Jackson v. CSX Transp., Inc.*, 712 So.2d 514 (La. App. 4 Cir. 1997); *Muckleroy v. OPI International, Inc.*, 42 F.3d 641 (5th Cir. 1994); *Bush v. Diamond Offshore Co.*, 46 F.Supp.2d 515 (E.D. La. 1999); *Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501 (5th Cir. 1989); *Daigle*, 322 F.Supp.2d 717; *Sanford v. Kostmayer Const. Co.*, 891 F.Supp. 1201 (E.D. La. 1995); *National R.R. Passenger Corp. v. Transwood*, 2002 WL 27761 (E.D. La. 2002).

In addition to past pain and suffering, the Plaintiff seeks damages for future pain and suffering.  At trial, the Plaintiff testified that his neck continues to hurt.  While the Court has no doubt that the Plaintiff suffered pain as a result of his accident and subsequent surgery, Doctor Martino's deposition testimony regarding Plaintiff's recovery, the surveillance videos, and the Court's careful observation of Mr. Commings during the course of the bench trial, all lead the Court to conclude that the Plaintiff has recovered from his surgery.  He is a very fortunate man. In particular, this Court finds that the surveillance videos taken in February and March 2007 clearly indicate that the Plaintiff did not appear to be in pain at the time the videos were taken.

29

The Court was troubled with the Plaintiff's statement that the February video was taken while he was in "extraordinary pain." While the Court appreciates that a surveillance video may only provide a "snapshot" of the Plaintiff's condition, the Court closely observed Plaintiff's behavior captured in the video, which showed the Plaintiff moving around very easily with no visible problems. Mr. Commings turned his neck easily and did not wear a neck brace. Further, the Court observed no sign of a limp. Significantly, the Plaintiff picked up a wrought iron chair with ease. In sum, the Court saw none of the "extreme pain" which the Plaintiff professed to be in during that time.

The following month, a second surveillance video was taken, which shows the Plaintiff wearing a neck brace to the doctor's office. The Plaintiff walked about very freely, without a limp. The Plaintiff testified that the video showed the pain that he was in; however, the Court saw no pain.

In addition to the Court's observations, the Court notes that the Plaintiff has provided no testimony regarding any future surgeries or future treatment for his neck. Rather, the medical testimony established that the Plaintiff's neck condition is stable. The Plaintiff testified that the last time he saw Dr. Irvin was February 2008. The Court has been presented with no evidence of any current treatment plan for the Plaintiff's neck pain.

Based on the foregoing, the Court finds that the Plaintiff has not met his burden in proving that an award for future pain and suffering is warranted or appropriate in this case. No

evidence was introduced at trial to suggest that the Plaintiff will incur any future medical expenses or disability caused by the November 5, 2006 accident. The Court finds that the Plaintiff is not entitled to damages for future pain and suffering.

####   C.   *Prejudgment interest*

"Pre-judgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 214-15 (5th Cir. 2006) (citing *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 613 (5th Cir. 2000)). "Pursuant to the court's admiralty jurisdiction invoked under the Federal Rules of Civil Procedure 9(h), when a Jones Act case is brought under the court's admiralty jurisdiction, and the case is tried to the Court and not to a jury, an allowance of prejudgment interest is within the discretion of the trial court, even if there is not a finding of unseaworthiness." *Bush*, 46 F.Supp.2d at 523 (citing *Williams v. Reading and Bates Drilling Co.*, 750 F.2d 487 (5th Cir. 1985); *Doucet v. Wheless Drilling*, 467 F.2d 336 (5th Cir. 1972)).

There is a strong presumption in favor of awarding prejudgment interest in this circuit; such interest will usually be denied only in cases in which the Plaintiff exercised undue delay in bringing the action. *United States v. Ocean Bulk Ships., Inc.*, 248 F.3d 331, 344 (5th Cir. 2001)). Prejudgment interest may be awarded only on damages that have actually accrued as of the date of judgment. *Martin v. Walk, Haydel & Assocs., Inc.*, 794 F.2d 209, 212 (5th Cir. 1986).

However, the starting date and rate of interest is left to the sound discretion of the Court. *Simmons v. Transocean Offshore Deepwater Drilling Inc.*, 551 F.Supp.2d 471, 477 (E.D. La. 2008) (Fallon, J.). The Court finds that an award of prejudgment interest is warranted on Plaintiff's past wages and past pain and suffering.

## IV.    CONCLUSION

On the basis of the foregoing Findings of Fact and Conclusions of Law, and for the reasons orally stated, the Court finds that the Plaintiff suffered damages as a result of Defendant's negligence in part, and as a result of Plaintiff's negligence in part. As such, the Plaintiff is entitled to recover from the Defendant the amount of $218,617.23, itemized as follows:

(1) Past wage loss:            $ 18,617.23;

(2) Past pain and suffering:    $ 200,000.00;

However, based on the Court's previous findings regarding liability, that total award must be reduced by ninety percent. Additionally, the Plaintiff is entitled to prejudgment interest on the above-mentioned past losses, from the date of judicial demand, at the rate of 6.0%. Upon the signing of the Judgment, the Plaintiff is entitled to interest at a rate of 8.5%.

August 22, 2008

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE